**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**WESTERN DIVISION**

**J.D. FIELDS & COMPANY, INC.**                                        **PLAINTIFF**

**v.**                              **Case No.: 4:12-cv-00754-KGB**

**NUCOR-YAMATO STEEL**                                        **DEFENDANT**

## OPINION AND ORDER

Plaintiff J.D. Fields & Company, Inc. ("Fields") brings this action against defendant Nucor-Yamato Steel Company ("NYS"), alleging violations of the Robinson-Patman Act, 15 U.S.C. § 13(a), and state-law claims of tortious interference, fraudulent misrepresentation, negligent misrepresentation, conspiracy, and breach of contract. Before the Court is NYS's motion for judgment on the pleadings (Dkt. No. 37). Fields has responded (Dkt. No. 58), and NYS has replied (Dkt. No. 60). For the following reasons, the motion is granted in part and denied in part (Dkt. No. 37).

### I.    FACTUAL AND PROCEDURAL BACKGROUND

Defendant NYS is a manufacturer and supplier of structural steel products, including products known as H-pilings.[1] NYS is one of three U.S. manufacturers of H-pilings (Dkt. No. 1, ¶ 7). Fields is a supplier of structural steel products, including H-pilings, throughout the United States. On May 4, 2005, Fields and NYS entered into a seven-year supply agreement in which NYS agreed to be Fields's exclusive supplier, and Fields agreed to purchase its requirement for structural steel products to be sold by Fields in North America (*Id.*, ¶ 8).

---

[1] Fields's complaint alternates between the terms "H-pilings" and "H-piles".

During the "covered period" [2] of NYS's and Fields's supply agreement, NYS had supply agreements with distributors, customers, and dealers of H-pilings in the "relevant market" [3] other than Fields.  Fields alleges that NYS had a contract with one of these distributors, customers, and dealers that was a competitor of Fields — a company known as Skyline Steel LLC ("Skyline"), a subsidiary of ArcelorMittal (Dkt. No. 1, ¶ 11).

Fields alleges that prior to and during the covered period, it "repeatedly requested commercially reasonable assurances from [NYS] that Fields would be and was receiving equal pricing and benefits to what [NYS] was, or would be, offering to other distributors, customers, and purchasers including Skyline, in the relevant market."  (Dkt. No. 1, ¶ 12).  In addition, Fields alleges that it had an earlier supply agreement with NYS from 1999 through 2005 and that, in entering into the earlier agreement, it relied on assurances from NYS that it would receive equal pricing for steel products throughout the duration of their contractual relationship (*Id.*).  Fields states that it entered into the latest supply agreement with NYS in 2005 based on the same assurances of equal pricing from NYS (*Id.*).

Fields alleges that, on or about June 16, 2010, it placed an order with NYS for 10" and 14" H-pilings and NYS sent back a sales-order acknowledgment indicating a shipment of the same products to Skyline (Dkt. No. 1, ¶ 13).  Fields states that NYS had provided a quote to Fields "at which product was made available for purchase by Fields at an effective price of $34.00/cwt," but the acknowledgement NYS made to Skyline "reflected a purchase price of only

---

[2] As used in the complaint, the term "covered period" refers to "the time period covered by the latest supply agreement between Fields and [NYS], which ran from May 4, 2005 until May 4, 2012."  (Dkt. No. 1, ¶ 9).

[3] As used in the complaint, the term "relevant market" refers to "the product market of structural steel products, including H-pilings, in the geographic market of North America, including the United States and the geographic submarkets of the states and territories in which Fields and [NYS] did business during the covered period."  (*Id.* ¶ 10).

$32.00/cwt.   The difference on that order alone amounted to a price differential of over $20,000.00." (*Id.*).

Fields claims that it "has since learned" that NYS "has engaged in a pattern of conduct during the covered period of providing Skyline preferential pricing in the relevant market of at least $2.00/cwt (if not more) on other sales below the prices [NYS] quoted to Fields for identical commodities." (Dkt. No. 1, ¶ 14).   Fields states that NYS continued to represent that none of its other distributors received preferential pricing even after Fields asked about these discrepancies (*Id.*).   Fields claims that, as a direct result of the preferential pricing NYS provided to Skyline in the relevant market during the covered period, NYS gave Skyline a competitive advantage over Fields, which enabled Skyline to offer lower quotations than Fields on projects for which both Fields and Skyline competed (*Id.*, ¶ 15).   Fields alleges that, as a result, "it lost out on price quotes for governmental and other contracts on which Fields competed with Skyline.   Skyline was able to quote lower prices than Fields on these projects because of the preferential treatment." (*Id.*).

Fields further alleges that NYS actively worked with Skyline to undercut Fields on its price quotes for these projects by misrepresenting the availability of structural steel products, such as H-pilings (Dkt. No. 1, ¶ 16).   "For example, when Fields sought information from [NYS] on the availability of H-piles in order to offer a price quote on certain projects, [NYS] would tell Fields that no such quantities of H-piles were available during the time period needed and usually declined to make additional rollings for such products to fulfill Fields's request." (*Id.*).

Fields states that NYS often advised it that no supplies of H-piles were available during various time periods but would supply such H-piles to Skyline or make additional rollings of such products at Skyline's request (*Id.*, ¶ 17).   Fields states that NYS "repeatedly restricted its

allocation of H-piles to Fields, while [NYS] did not place any such restrictions on Skyline. As a direct result, Skyline was able to offer quotes and be awarded contracts on such projects over Fields in the relevant market during the covered period." (*Id*.).

Fields's complaint then references several "specific examples" of NYS's alleged conduct regarding purported preferential pricing and product availability in July and August 2009 (Dkt. No. 1, ¶¶ 18-20). First, Fields alleges that, in July 2009, it requested a project price from NYS in order to offer a quote to supply H-piles for a highway interchange in San Bernardino County, California. Fields states that NYS failed to provide a project price and instead offered Fields a "mill price" of $39.00/cwt and advised that transportation costs would be an additional $3.08/cwt to $4.97/cwt. Fields states that it subsequently learned that NYS offered a lower mill price and lower transportation cost to Skyline, leaving Fields unable to offer a competitive low price quote on the project (*Id*., ¶18).

Fields alleges that it sought another quote from NYS in mid-August 2009 for Fields to offer a quote to supply steel for a later phase of the San Bernardino County highway interchange project. Fields states that NYS refused at the time to supply Fields with the H-piles requested for less than $35.00/cwt, leaving Fields unable to offer a competitive quote on the project. Fields states that it learned that other contractors offering quotes on the project, including Skyline, had received quotes at significantly lower prices from NYS, giving those contractors a competitive advantage over Fields (Dkt. No. 1, ¶ 19).

Fields alleges that, in late August 2009, it sought another quote from NYS for H-piles and wide flange beams to offer a quote on another project. Fields claims that NYS offered it the steel products for $37.00/cwt, even though Fields had advised NYS that it could not offer a quote on the job at a price higher than $35.00/cwt. Fields states that NYS did not alter its quote to

Fields even though it had offered a lower quote to Skyline, leaving Fields unable to offer a competitive quote on the project (Dkt. No. 1, ¶ 20).

In addition, Fields alleges that NYS refused to provide it with quotes for steel products pertaining to jobs in Puerto Rico, although the supply agreement between Fields and NYS for the North American market did not restrict Fields from supplying steel products in Puerto Rico. Fields claims that NYS had effectively given Skyline an "exclusive" with respect to supplying H-pile steel for jobs in Puerto Rico, and that, as a direct result of NYS's discriminatory practices, it was unable to offer competitive quotes for jobs in Puerto Rico (Dkt. No. 1, ¶ 21).

Fields's complaint also alleges that, in addition to H-piles, Fields sought to supply a separate structural steel product, known as sheet piles, to the relevant market during the covered period, but NYS unreasonably terminated Fields's right to be a distributor for sheet piles based on Fields's prior relationship with a foreign manufacturer of sheet piles. Fields claims that NYS had provided sheet piles to others, including Skyline, and that NYS sold sheet piles to Skyline when Skyline was also selling foreign-manufactured sheet piles in the domestic market. Fields claims that it was forced to purchase sheet piles from third parties at a markup above what NYS was offering to its sheet-piles dealers, customers, or distributors (Dkt. No. 1, ¶ 22).

Fields's seven-year supply contract with NYS terminated on May 4, 2012. Fields claims that on May 17, 2012, NYS announced that it would acquire Skyline in a buyout pending regulatory approval, and on June 21, 2012, NYS announced that it had completed its acquisition of Skyline (Dkt. No. 1, ¶ 24).[4]

On June 26, 2012, Fields filed its complaint in the United States District Court for the Southern District of Texas, alleging violations of the Robinson-Patman Act, 15 U.S.C. § 13(a),

---

[4]   The parties' briefing indicates that it was NYS's general partner, Nucor Corporation, that acquired Skyline (Dkt. No. 38, at 14 n.5;  Dkt. No. 58, at 9).

and claims for tortious interference, fraudulent misrepresentation, negligent misrepresentation, conspiracy, and breach of contract (Dkt. No. 1).  On August 20, 2012, NYS moved to dismiss the complaint for lack of personal jurisdiction and / or improper venue pursuant to Federal Rule of Civil Procedure 12(b)(2) and (3), or in the alternative, to transfer the case to this district (Dkt. No. 20).  On December 4, 2012, the United States District Court for the Southern District of Texas entered an opinion and order transferring the case to this Court (Dkt. No. 31).  The same day, NYS answered Fields's complaint (Dkt. No. 36) and filed its motion for judgment on the pleadings (Dkt. No. 37).  NYS contends that Fields's complaint fails to state a claim upon which relief can be granted and requests that the Court dismiss Fields's complaint.

## II.     LEGAL STANDARD

On a motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, the Court applies the same legal standard as it applies to a motion to dismiss for failure to state a claim for which relief can be granted pursuant to Rule 12(b)(6).  *Gallagher v. City of Clayton,* 699 F.3d 1013, 1016 (8th Cir. 2012).  Federal Rule of Civil Procedure 8(c)(2) requires only "a short and plain statement of the claim that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  Specific facts are not required; the complaint must simply "'give the defendant fair notice of what . . . the claim is and the grounds upon which it rests.'"  *Erickson v. Pardus*, 581 U.S. 89, 93 (2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  However, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).  "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.  Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"  *Id*. (internal

citations omitted).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id*.  "The plausibility standard requires a plaintiff to show at the pleading stage that success on the merits is more than a 'sheer possibility.'"  *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009) (quoting *Iqbal*, 556 U.S. at 678).  "The plausibility standard is not a probability requirement.  Thus, a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of the facts alleged is improbable, and that a recovery is very remote and unlikely."  *Id*. (internal quotations omitted).

In *Twombly*, the Supreme Court abrogated the former "no set of facts" standard announced in *Conely v. Gibson*, 355 U.S. 41, 45-46 (1957).  In that case, the Supreme Court determined that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  *Id*.  The Court reaffirmed *Twombly*'s abrogation of *Conley* in *Iqbal*, 556 U.S. at 678.  However, as the Eighth Circuit has recognized, *Twombly* and *Iqbal* "did not abrogate the notice pleading standard of Rule 8(a)(2)."  *Hamilton v. Palm*, 621 F.3d 816, 817 (8th Cir. 2010).  "Rather, those decisions confirmed that Rule 8(a)(2) is satisfied 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'"  *Id*.; *see also Twombly*, 550 U.S. at 570 ("[W]e do not require heightened fact pleading of specific facts, but only enough facts to state a claim to relief that is plausible on its face.  Because the plaintiffs here have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed.")

In applying this standard, "the complaint should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible."  *Braden*, 588 F.3d at 594

(citing *Vila v. Inter–Am. Inv. Corp.*, 570 F.3d 274, 285 (D.C. Cir. 2009) (factual allegations should be "viewed in their totality")).  "Ultimately, evaluation of a complaint upon a motion to dismiss is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Id*. (quoting *Iqbal*, 556 U.S. at 679).

The Eighth Circuit has noted that "[t]he liberal rules of pleading embodied in Fed. R. Civ. P. 8 are as applicable to claims in antitrust or price discrimination cases as they are in any other case." *Fusco v. Xerox Corp.*, 676 F.2d 332, 337 n.7 (8th Cir. 1982).  "Moreover, in antitrust cases, where the proof is largely in the control of the defendant, 'dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly.'"  *Id*. (quoting *Hospital Bldg. Co. v. Trs. of Rex Hospital*, 425 U.S. 738, 746 (1976)).

## III.    ANALYSIS

NYS argues that Fields's complaint fails to state a claim upon which relief can be granted.  As to the Robinson-Patman Act, NYS argues that Fields has merely alleged non-actionable discriminatory offers to sell or refusals to sell.  NYS further challenges Fields's state-law claims for tort and breach of contract.

### A.    Robinson-Patman Act Claims

The Robinson-Patman Act provides in relevant part:

> It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, . . .  where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them.

15 U.S.C. § 13(a).[5]

---

[5]   Section 1 of the Robinson-Patman Act, 49 Stat. 1526, amended § 2(a) of the Clayton Act, 38 Stat. 70.  Accordingly, the courts often refer to 15 U.S.C. § 13(a) by its designation as §

The Robinson-Patman Act does "not ban all price differences charged to different purchasers of commodities of like grade and quality, rather, the Act proscribes price discrimination only to the extent that it threatens to injure competition." *Volvo Trucks N. Am., Inc. v. Reeder-Simco GMC, Inc.*, 546 U.S. 164, 176 (2006) (internal quotations and citation omitted). The Supreme Court has recognized three categories of competitive injury that may give rise to a Robinson-Patman Act claim: primary line, secondary line, and tertiary line. *Id.* Primary-line cases entail conduct that injures competition at the level of the discriminating seller and its direct competitors (e.g., predatory pricing), secondary-line cases involve price discrimination that injures competition among the discriminating seller's customers, and tertiary-line cases involve injury to competition at the level of the purchaser's customers. *Id.* Here, Fields has alleged secondary-line injury, where NYS is the allegedly discriminating seller and Fields is the allegedly disfavored purchaser. *See id.* To state a claim for secondary-line injury, Fields must show that: (1) the relevant sales of the commodities in question, the H-pilings, were made in interstate commerce; (2) the H-pilings were of "like grade and quality"; (3) NYS "discriminate[d] in price between" Fields and another purchaser of NYS's H-pilings; and (4) "the effect of such discrimination may be . . . to injure, destroy, or prevent competition" to the advantage of a favored purchaser, *i.e.,* one who "receive[d] the benefit of such discrimination." *Id.* at 176-77. At issue here is whether Fields's allegations satisfy the elements of price discrimination and competitive injury.

Because the Robinson-Patman Act only prohibits discrimination between "purchasers," the element of price discrimination requires two transactions or sales "at two different prices to two different actual buyers." *See Fusco*, 676 F.2d at 334-35 ("There is nothing technical or

---

2(a) under the Clayton Act. *See, e.g.*, *Volvo Trucks N. Am., Inc. v. Reeder-Simco GMC, Inc.*, 546 U.S. 164, 175 (2006) ("Section 2, 'when originally enacted as part of the Clayton Act . . . .'").

talismanic about the term purchaser.  The term purchaser means simply one who purchases, a buyer, a vendee.  It does not mean one who seeks to purchase, a person who goes into the market-place for the purpose of purchasing.") (internal quotations omitted).  "Moreover, no single sale can violate the Robinson-Patman Act.  At least two transactions must take place in order to constitute discrimination."  *Bruce's Juices, Inc. v. Am. Can Co.*, 330 U.S. 743, 755 (1947).  "[T]here must be actual sales at two different prices to two different actual buyers.'"  *Fusco*, 676 F.2d at 335 (quoting *M. C. Mfg. Co. v. Texas Foundries, Inc.*, 517 F.2d 1059, 1065 (5th Cir. 1975)).  "Thus, a sale at one price plus either an offer to sell at a higher price or a refusal to sell at any price is generally thought not to violate the Act."  *Id.*

As to competitive injury, the Supreme Court has stated that a "hallmark of the requisite competitive injury . . . is the diversion of sales or profits from disfavored purchaser to a favored purchaser."  *Volvo*, 546 U.S. at 177 (citing *FTC v. Sun Oil Co.,* 371 U.S. 505, 518–519 (1963) (evidence showed patronage shifted from disfavored dealers to favored dealers); *Falls City Indus., Inc. v. Vanco Beverage, Inc.*, 460 U.S. 428, 437–438, and n.8 (1983) (complaint "supported by direct evidence of diverted sales")).  The Supreme Court has "also recognized that a permissible inference of competitive injury may arise from evidence that a favored competitor received a significant price reduction over a substantial period of time."  *Id.* (citing *FTC v. Morton Salt Co.,* 334 U.S. 37, 49–51 (1948); *Falls City Indus.,* 460 U.S. at 435)).  However, competitive injury cannot be shown in a secondary-line case absent actual competition with the favored purchaser.  *Id.* ("Absent actual competition with a favored Volvo dealer, however, Reeder cannot establish the competitive injury required under the Act.").  Accordingly, a manufacturer cannot be held liable for secondary-line price discrimination under the Robinson-

Patman Act in the absence of a showing that the manufacturer discriminated between dealers competing to resell its product to the same retail customer.  *See id*. at 169, 175.

Fields' complaint alleges that NYS violated the Robinson-Patman Act "on multiple occasions" by "1) charging Skyline at least $2.00/cwt less than the prices at which [NYS] charged or offered to sell to Fields for the same product or commodity; 2) making product available to Skyline that [NYS] failed to make available to Fields; or 3) supplying Skyline with product in certain geographic areas which [NYS] failed to supply to Fields."  (Dkt. No. 1, ¶ 27). Fields claims that NYS's actions resulted in Fields "being unable to offer competitive quotes against Skyline for certain projects, which decreased the amount of competition in the relevant market during the covered period."  (*Id*., ¶ 28).  Further, Fields states that NYS's "discrimination in pricing and distribution in favor of Skyline had an effect which substantially lessened competition or tended to create a monopoly in the relevant market, or which injured, destroyed or prevented competition in the relevant market."  (*Id*.).

As an initial matter, the Court agrees with NYS that Fields abandoned its claims that NYS violated the Robinson-Patman Act by "2) making product available to Skyline that [NYS] failed to make available to Fields; or 3) supplying Skyline with product in certain geographic areas which [NYS] failed to supply to Fields" because Fields failed to respond to NYS's motion as to these claims (Dkt. No. 38, at 16-24; Dkt. No. 60, at 16).  Accordingly NYS's motion for judgment on the pleadings is granted as to these claims.  Therefore, the remaining issue with respect to the Robinson-Patman Act claims for the Court to examine  is whether Fields states a claim for price discrimination that survives NYS's motion for judgment on the pleadings.  NYS argues that Fields's complaint fails to state a claim under the Robinson-Patman Act because its allegations fail to establish either the two-sales requirement or the requisite competitive injury.

### 1.   Two-sales Requirement

NYS argues that Fields's complaint fails to allege two completed sales that are actionable under the Robinson-Patman Act but relies instead on allegations of non-actionable discrimination in quotes or offers to sell.  Fields responds that NYS misconstrues its allegations, which are based on systematic price discrimination during its contract period, and asserts that it has alleged specific sales to both it and Skyline, at different prices, at the same time, while NYS had long-term supply contracts with both Fields and Skyline (Dkt. No. 58, at 13-15).  Fields states that it has alleged "numerous examples of likely price discrimination, including one instance where NYS mistakenly sent Fields a price confirmation of a sale to Skyline at a price $2/cwt less than the price at which Fields was purchasing the same month."  (*Id*. at 19 (citing Dkt. No. 1, ¶ 13)).  NYS responds that Fields misunderstands the two-sales requirement in that Fields "appears to assume that all the two-sales rule requires is that NYS made past sales to both []Fields and Skyline."  (Dkt. No. 60, at 8).  NYS argues that, to the extent Fields's complaint could be construed to allege specific sales, it does not specifically allege "actual sales to both Fields and Skyline, at different prices, at the same time."  (Dkt. No. 60, at 9-12).

In addition to maintaining that it has pleaded sufficient facts to allege an actionable claim under the Robinson-Patman Act based on two completed sales, Fields claims the two-sales requirement is satisfied by virtue of the supply contracts between NYS and Fields and between NYS and Skyline (Dkt. No. 58, at 15).  Fields has cited several cases standing for the proposition that parties to an executory contract for the sale of specified goods are not mere "offerees" or "offerors" but are "seller" and "purchaser" within the Robinson-Patman Act.  *See Aluminum Co. of Am. v. Tandet*, 235 F. Supp. 111, 114 (D. Conn. 1964); *J. W. Burress, Inc. v. JLG Indus., Inc*., 491 F. Supp. 15 (W.D. Va. 1980) ("It cannot . . . be said that a 'purchase' has occurred until

buyer and seller have completed their negotiations and have in some way expressed their mutual assent that legally enforceable expectations and commitments arise. . . . [T]here must be a contract.  It is sufficient that the contract be merely executory; actual delivery and payment are not essential to a 'purchase' for Robinson-Patman purposes.") (citing *Tandet*, 235 F. Supp. 111); *En Vogue v. UK Optical Ltd.*, 843 F. Supp. 838, 846 (E.D.N.Y. 1994) (finding purchaser status under Robinson-Patman Act where parties had "a contractual relationship that, similar to the relationship in *Tandet*, contemplated a completed transaction of minimum purchases . . . ."); Fields also cites the Fifth Circuit's exception to the two-purchaser requirement.  This exception finds the sale requirement satisfied "where competitors in the same market are engaged in competitive purchasing and selling at the time of the price discrimination and where the failure of the plaintiff to consummate a second purchase of the item discriminatorily priced is directly attributable to defendant's own discriminatory practice."  *See M.C. Mfg.*, 517 F.2d at 1066-67 n.17 (construing the holding of *Am. Can. Co. v. Bruce's Juices, Inc.*, 187 F.2d. 919, 924 (5th Cir.), *cert. dismissed*, 342 U.S. 875 (1951)).  The Eighth Circuit in *Fusco* noted the Fifth Circuit's exception to the general requirement of two sales.  *Fusco*, 676 F.2d at 335 ("Nevertheless, it has also been held that an established customer who is currently purchasing one type of goods at a higher price and is denied the right to buy a lower-priced good of 'like grade and quality' which is being sold to a competitor can sue under the Act.") (citing *Bruce's Juices*, 187 F.2d. at 924)

NYS contends that the Fields's arguments rely primarily on the exception stated by the Fifth Circuit in *Bruce's Juices*, 187 F.2d 919, which NYS states has been criticized, rejected, or narrowly limited by other courts (Dkt. No. 60, at 13-14, and n. 4).  *See, e.g., Republic Packaging Corp. v. Haveg Indus., Inc.*, 406 F. Supp. 379, 381 (N.D. Ill. 1976) (in refusing to extend

Robinson-Patman Act to claim of "failure to sell," stating that "the Court believes that *Bruce's Juices* is inconsistent with the plain statutory language requiring consummated transactions."); *Data Capture Solutions-Repair & Remktg., Inc. v. Symbol Techs., Inc.*, 520 F. Supp. 2d 343, 346-49 (D. Conn. 2007) (noting that "[c]ourts across the country have varied widely on their interpretation of the [Robinson-Patman Act] and the Two-Purchaser Rule[,]" including *Bruce's Juice's*, but holding that "mere offers to sell at different prices do not suffice to state a claim under the Robinson-Patman Act" and finding no cause of action in refusals to offer "price exceptions" given to plaintiff's competitors); *Gillette Tire Jobbers of La., Inc. v. Appliance Indus., Inc.*, 596 F. Supp. 1277, 1278 (E.D. La. 1984) (stating that *Bruce's Juices* "has been severely criticized and seems to be in direct conflict with the line of cases which hold that a seller has the right to refuse to sell to any prospective customer.") (citations omitted); *Stevens v. Zenith Distrib. Corp. of Kan.*, 568 F. Supp. 1200, 1201 (W.D. Mo. 1983) (stating that *Bruce's Juices* "is considered 'an aberration'") (quoting Hugh C. Hansen, *Robinson-Patman Law: A Review and Analysis*, 51 Fordham L. Rev. 1113, 1213 (1983)); *J. W. Burress, Inc.*, 491 F. Supp. at 17-19 ("*Bruce's Juices* does not, in this court's view, stand for the proposition that a plaintiff in Burress' position may recover under the Robinson-Patman Act without having contracted to purchase goods at a discriminatory price.") (rejecting argument that *Bruce's Juices* permitted plaintiff to assert "purchaser" status solely on basis of allegedly discriminatory offer to sell where proposed contract for sale was never signed or entered into).  NYS discounts the other cases cited by Fields, *En Vogue*, 843 F. Supp. 838, *Tandet*, 235 F. Supp. 111, on the argument that these cases "simply follow *Bruce's Juices*, without any critical analysis and against the great weight of authority."  (Dkt. No. 60, at 9 n.5).

The Court concludes based on its review of the law and the facts alleged in Fields's complaint that Fields's complaint is sufficient to overcome NYS's motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) based on the two-sales requirement.  The Court "do[es] not require heightened fact pleading of specific facts, but only enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.  In reviewing a motion to dismiss, the Court is required to read the complaint as a whole and to view the facts in their totality.  *See Braden*, 588 F.3d at 594.  "Ultimately, evaluation of a complaint upon a motion to dismiss is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'"  *Id.* (quoting *Iqbal*, 556 U.S. at 679).  Applying this standard, the Court concludes that Fields has alleged enough factual context in its complaint to state a claim for price discrimination under the Robinson-Patman Act.

## 2.    Competitive Injury

NYS argues that, even if Fields can show two completed transactions or sales, it fails to satisfy the requirement of competitive injury.  Specifically, NYS argues that Fields has not alleged sufficient facts to show that it and Skyline were "competing to resell the H-pilings to the same customer of their own."  (Dkt. No. 60, at 12-13); *see Volvo*, 546 U.S. at 169, 178 (determining that a secondary-line claim under the Robinson-Patman Act requires a showing that a manufacturer discriminated "between dealers contemporaneously competing to resell to the same retail customer.").  NYS argues that Fields's only factual support is its examples of competition in paragraphs 18 to 20 of its complaint, which only reference quotes and, therefore, fail to meet the threshold requirement of a completed sale.  In addition, NYS argues that where Fields's complaint could be read to allege specific sales, it fails to allege specifically that it and Skyline were competing for the same customer at the time (Dkt. No. 38, at 22-23; Dkt. No. 60, at

12-13, 15-16 (citing Dkt. No. 1, ¶¶ 13, 18-20)).  In other words, NYS argues that, even if Fields

alleged facts showing specific sales and facts showing competition, it never alleged these

*together*.

Reading the complaint as a whole, viewing the factual allegations in their totality, and

drawing on its judicial experience and common sense, as the Court is required to do, *Braden*, 588

F.3d at 594, the Court concludes that Fields's complaint alleges sufficient factual context as to

competitive injury.  Fields's complaint alleges a pattern of discriminatory pricing in completed

sales and alleges that Fields and Skyline were in direct competition at the time of the alleged

discriminatory pricing.  For these reasons, the Court concludes Fields in its complaint provides

enough factual context to show facial plausibility.  To the extent Fields's complaint has not

alleged facts as specific as NYS suggests it should, the Court notes that "further

particularization" of Fields's claims "clearly is attainable through discovery procedures.  In the

event that [Fields] fails to uncover facts substantiating the discriminatory sale allegations,

summary judgment is available to avoid expensive trials of frivolous claims."  *Fusco*, 676 F.2d at

337 n.7  (internal quotations and citations omitted).

Lastly, the Court notes NYS's arguments that the Robinson-Patman Act does not reach

competitive bidding markets.  As the argument goes, a buyer in a competitive-bidding market

can never satisfy both the completed purchase requirement and the competition requirement

because only one of the two competitors will win the bid and actually make the purchase.  *See,*

*e.g.*, *Reeder-Simco GMC, Inc. v. Volvo GM Heavy Truck Corp.*, 374 F.3d 701, 708 (8th Cir.

2004).  The Court finds this unpersuasive.  In *Volvo*, the Supreme Court expressly withheld from

adopting this argument.  546 U.S. at 179-80.  More importantly, the Court does not see that the

instant motion requires it to decide this issue at this time because it is not clear that this case

represents a market "characterized by competitive bidding and special-order sales, as opposed to sales from inventory." *Id.* It is not clear from the complaint or the parties' briefing that the H-pilings at issue can be characterized as "special-order sales" such that Fields or another distributor would never have such product to sell from inventory.

For these reasons, the Court concludes that Fields has sufficiently stated a claim for price discrimination under the Robinson-Patman Act. Therefore, NYS's motion is denied as to these claims. However, as stated above, NYS's motion is granted on the Robinson-Patman Act claims regarding discrimination in product availability and geographic distribution.

### B.      State-law Claims

Turning to Fields's state-law claims, the Court first must determine whether to apply Arkansas or Texas law to Fields's state-law claims pursuant to the choice-of-law provisions in the parties' contract. [6] "Federal district courts sitting in diversity, as the district court in this case, must apply the forum state's substantive law, including its conflict of law rules." *Guardian Fiberglass, Inc. v. Whit Davis Lumber Co.*, 509 F.3d 512, 515 (8th Cir. 2007). "Arkansas courts will honor a choice of law provision, 'provided that the law selected is reasonably related to the transaction and does not violate a fundamental public policy of the state.'" *Id.* (quoting Arkansas Civil Practice and Procedure § 6:7 (citing *Nursing Home Consultants, Inc. v. Quantum Health Servs., Inc.*, 926 F.Supp. 835 (E.D.Ark.1996))).

---

[6]   NYS attached the supply agreement to its motion to dismiss (Dkt. No. 38-1). The Court need not exclude the supply agreement to avoid converting the motion to one for summary judgment, as it may treat the agreement as incorporated into the complaint by reference. *See Moses.com Securities, Inc. v. Comprehensive Software Sys., Inc.*, 406 F.3d 1052, 1063 n.3 (8th Cir. 2002) (citing *Venture Assoc's Corp. v. Zenith Data Sys.,* 987 F.2d 429, 431 (7th Cir. 1993) ("Documents that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to [its] claim")).

NYS asserts that Arkansas law applies to all of Fields's state-law claims, contract and tort, in view of the choice-of-law provisions in the supply agreement and in the terms and conditions of sale (Dkt. No. 38, at 24 n.12).  The supply agreement contains a choice-of-law provision that states in relevant part, "This Agreement shall be governed by the laws of the State of Arkansas, without regard to its choice of law provisions."  (Dkt. No. 38-1, at 4, ¶ 10).  The remainder of the provision concerns arbitration (*Id.*).  In addition, exhibit 2 to the supply agreement, the "terms and conditions of sale," contains a choice-of-law and forum selection clause, which states that "[t]his agreement shall be governed by the laws of Arkansas.  Buyer, acting for itself and its successors and assigns, hereby expressly and irrevocably consents to the exclusive jurisdiction of the state and federal courts of Arkansas for any litigation which may arise out of or be related to this agreement . . . ."  (Dkt. No. 38-1, at 9, ¶ 12).

 Fields agrees that this provision governs the contract action but argues that "it does not necessarily govern the tort causes of action, because it specifies only that the contract, not all claims, will be governed by Arkansas law."  (Dkt. No. 58, at 19 n.3) (citing *Inacom Corp. v. Sears, Roebuck & Co.*, 254 F.3d 683, 687-88 (8th Cir. 2001)).[7]

The Court finds persuasive *Northwest Airlines, Inc. v. Astraea Aviation Services., Inc.*, 111 F.3d 1386 (8th Cir. 1997), in which the Eighth Circuit held that plaintiff's tort actions were governed by the scope of a choice-of-law provision stating, "This agreement shall be deemed entered into within and shall be governed by and interpreted in accordance with the laws of the State of Minnesota . . . ." *Id.* at 1392 (contracts for aircraft refurbishment).  The court determined

---

[7]  For purposes of this motion, this distinction is only determinative as to the elements of the claim for negligent misrepresentation, as Fields agrees with NYS "that the substantive law of Texas and Arkansas [are] essentially the same for each of the tort counts, except the negligent misrepresentation count."  (Dkt. No. 58, at 19-20 n.3).  The parties argue whether, if Texas law applies, a shorter limitations period applies to bar certain of these tort claims.  Because the Court determines Arkansas law applies, the Court does not reach the limitations issue.

that plaintiff's tort claims of negligent performance, misrepresentation, deceptive trade practices, and unjust enrichment "raise[d] issues of performance and compensation for work done under the refurbishment contract."  *Id.*  ("Although mainly styled as torts, these claims stem from Northwest's alleged failure promptly to provide functioning parts and adequate support for the refurbishment project, as required under the contracts.  The unjust enrichment claim concerns the amount of compensation which Astraea should receive for refurbishing aircraft pursuant to a contract.").  Therefore, the court concluded that they were "closely related to the interpretation of the contracts and fall within the ambit of the express agreement that the contracts would be governed by Minnesota law."  *Id.* at 1392; *see also Holden Farms, Inc. v. Hog Slat, Inc.*, 347 F.3d 1055, 1058, 1061 (8th Cir. 2003) ("Whether such tortious activity occurred requires an analysis of whether the contract included such warranties and of what the warranties meant.  Thus, in analyzing the tortious behavior we are essentially analyzing the contract.  Therefore, the *Northwest Airlines* rule applies . . . .") (where choice-of-law clauses provided that the contracts were "controlled and governed, and the parties agree to be bound by" North Carolina and Iowa law).

Here, as in *Northwest Airlines*, Fields's tort claims relate to performance of the underlying contract and "fall within the ambit of the express agreement that the contracts would be governed by [Arkansas] law."  111 F.3d 1386.  Therefore, the Court will apply Arkansas law in addressing Fields's claims of tortious interference, fraudulent representation, negligent representation, conspiracy, and breach of contract.[8]

---

[8]  Fields pleads conspiracy as its third cause of action (Dkt. No. 1, ¶¶ 33-36).  However, the Court considers the claims in the order briefed by the parties.

1.      **Tortious Interference**

Fields's claim for tortious interference alleges that NYS "repeatedly provided Skyline with preferential pricing, greater product availability and geographical preferences during the covered period in the relevant market.  Had [NYS] not done so, Fields would have won one or more of the contracts for government or other projects previously described."  (Dkt. No. 1, ¶¶ 31-31).  The complaint further alleges that NYS "was aware that Fields and Skyline competed for such contracts and intentionally interfered with Fields' price quotes by providing preferential pricing, product availability and geographic preferences to Skyline in violation of United States antitrust laws."  (*Id.*).  The complaint claims that Fields lost several contracts as a result of the alleged tortious interference (*Id.*, ¶ 32).

Under Arkansas law, the elements of tortious interference are:  (1) the existence of a valid contractual relationship or a business expectancy; (2) knowledge of the relationship or expectancy on the part of the interfering party; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted.  *Baptist Health v. Murphy*, 2010 Ark. 358, at 15, 373 S.W.3d 269, 281 (2010); *see Robertson Oil Co., Inc. v. Phillips Petroleum Co.*, 871 F.2d 1368, 1372 (8th Cir. 1989); 1 Arkansas Law Of Damages § 33:15 (5th ed.).  In addition, Arkansas "requires that the conduct of the defendants be at least 'improper,' and [Arkansas courts] look to the factors in section 767 of the *Restatement (Second) of Torts* for guidance about what is improper."  *Baptist Health*, 2010 Ark. 358, at 15, 373 S.W.3d at 281-82; *see K.C. Props. Of N.W. Ark., Inc. v. Lowell Inv. Partners, LLC*, 373 Ark 14, 26, 280 S.W.3d 1, 11 (2008); *Mason v. Wal-Mart Stores, Inc.*, 333 Ark. 3, 13-14, 969 S.W.2d 160, 165 (1998); *see* Ark. Model Jury Instr. (Civil) 403 (combining concepts to require "intentional and improper interference").

In determining whether an actor's conduct is improper, consideration is given to the following factors:  (a) the nature of the actor's conduct; (b) the actor's motive; (c) the interests of the other with which the actor's conduct interferes; (d) the interests sought to be advanced by the actor; (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other; and (f) the proximity or remoteness of the actor's conduct to the interference and the relations between the parties. *Baptist Health*, 2010 Ark. 358, at 15-16, 373 S.W.3d at 282; *K.C. Props of N.W. Ark., Inc.*, 373 Ark. at 26-27, 280 S.W.3d at 11-12.

NYS contends first that Fields's complaint fails to allege plausibly that NYS intended to harm Fields and engaged in behavior that is improper under Arkansas law (Dkt. No. 39, at 24-25).  Arkansas law provides that the defendant must have *either* desired to bring about the harm to the plaintiff *or* have known that the result was substantially certain to be produced by his conduct. *Baptist Health*, 2010 Ark. 358, at 22-23, 373 S.W.3d at 285.  Fields alleges that NYS actively sought to undercut Fields in the relevant market; this is sufficient to allege the required intent.

Nonetheless, NYS contends that Fields fails to allege facts that would prove "improper" conduct.  NYS asserts that the complaint essentially alleges that NYS treated another one of its customers more favorably than Fields and that Fields was incidentally affected.  NYS argues that, "[i]f anything, the Complaint paints a picture of a manufacturer trying to provide good service and competitive prices to an important customer that happened to compete with Fields, not one motivated by any animus or ill will toward Fields."  (Dkt. No. 38, at 25-26).  Fields responds that its complaint sets out the expected business relationships that were affected by NYS's misconduct, that NYS knew that Fields was seeking to bid on various projects, and that NYS engaged in the discriminatory practice to enable Skyline to underbid Fields on the same

projects and win the contract, thereby strengthening Skyline's position in the market (Dkt. No. 58, at 20-21 (citing Dkt. No. 1, ¶¶ 14-17, 31)).  Fields points to its allegations that, "[i]n response to product and pricing inquiries from Fields for projects on which it knew both Fields and [Skyline] were competing, NYS would misrepresent to Fields that product was not available, while making the same product available to Skyline, or would charge a higher price to Fields than to Skyline, while misrepresenting to Fields that it was receiving equal pricing."  (Dkt. No. 58, at 21 (citing Dkt. No. 1, ¶¶ 13-21)).  Fields alleges that "[s]uch conduct was not merely 'unfair,' but both improper and independently tortious (fraud and violations of antitrust law)." (*Id*.).

The comments to the Restatement include several examples of "improper" conduct for purposes of tortious interference, such as unlawful conduct (including violations of antitrust law), forms of economic pressure, or violations of recognized business practices.  Restatement (Second) of Torts § 766 cmt. c.  Furthermore, the comments to § 766 state, "Here, as with negligence, when there is room for different views, the determination of whether the interference was improper or not is ordinarily left to the jury, to obtain its common feel for the state of community mores and for the manner in which they would operate upon the facts in question." *Id*. cmt. *i*.  The Court concludes that Fields has alleged conduct that, if true, could support a claim for tortious interference under Arkansas law and the Restatement.

NYS further contends that Fields fails to allege plausibly that it would have won any identified business opportunity but for NYS's alleged conduct.  NYS argues that "[a]ll that [Fields] can muster are allegations . . . that Fields was 'unable to offer a competitive quote' or that other contractors had 'a competitive advantage.'" (Dkt. No. 83, at 25-26 (citing Dkt. No. 1, ¶¶ 19, 20)).  NYS characterizes Fields's allegations as vague and as "generalized boilerplate"

that is "no longer sufficient" under *Twombly* (Dkt. No. 60 at 17-18).  The Court does not agree. As Fields states in its response, its complaint specifically alleges that certain business relationships were affected by NYS's actions and that it likely would have been awarded contracts to supply third parties but for the alleged discrimination (Dkt. No. 58, at 20).  These allegations are sufficient under the notice-pleading standard set forth in Rule 8 of the Federal Rules of Civil Procedure.  Whether Fields can ultimately prove a valid business expectancy that was disrupted is a question to be addressed at a later stage of the litigation; its allegations are sufficient for now.  *See, e.g.*, *Capital Equip., Inc. v. CNH Am., LLC.*, 4:04-CV-00381GTE, 2004 WL 3406091, at *9 (E.D. Ark. Sept. 27, 2004) (determining that for a claim of tortious interference, plaintiffs did "not have to identify the customers they lost as a result of [defendant's] alleged improper actions at the pleading stage. . . .  Plaintiffs need not prove their case in their complaint").

The Court concludes that NYS has alleged sufficient facts supporting its tortious interference claim to survive a motion to dismiss.  Accordingly, NYS's motion for judgment on the pleadings is denied as to Fields's claim for tortious interference.

## 2.    Fraudulent Misrepresentation

Fields's complaint alleges that NYS gave false assurances to Fields that it was receiving equal pricing as other distributors and that NYS misrepresented the availability of products when Fields sought quotes from NYS (Dkt. No. 1, ¶¶ 38-44 (repeating ¶¶ 13-20)).  Based on these facts, Fields alleges that NYS repeatedly misrepresented to Fields that Fields was receiving equal pricing as other distributors in the relevant market, including Skyline.  In addition, Fields alleges that NYS repeatedly misrepresented to Fields the availability of product in the relevant market when Fields sought quotes from NYS, in that NYS told Fields that certain product was not

available, while at the same time NYS made the same product available to Skyline (*Id.*, ¶ 45). Fields asserts that these representations were material and that NYS made the representations either falsely or recklessly as a positive assertion without knowledge of the truth. Fields asserts that NYS did in fact provide preferential pricing and product availability to Skyline during the covered period in the relevant market, that NYS intended for Fields to rely on NYS's misrepresentations, and that Fields justifiably did so to its detriment. Fields contends that as a direct, proximate, and foreseeable result of the alleged fraudulent misrepresentations, Fields lost several contracts and paid higher prices for NYS's products than other distributors (*Id.*, ¶ 45-46).

The Court first considers whether Fields has sufficiently pleaded fraud under Rule 9(b) of the Federal Rules of Civil Procedure, which requires a party alleging fraud or mistake to "state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9 (b). The Eighth Circuit interprets Rule 9 "in harmony with the principles of notice pleading, and to satisfy it, the complaint must allege such matters as the time, place, and contents of false representations, as well as the identity of the person making the misrepresentation and what was obtained or given up thereby." *Drobnak v. Andersen Corp.*, 561 F.3d 778, 783 (8th Cir. 2009) (internal quotations and citation omitted). "This means the who, what, when, where, and how: the first paragraph of any newspaper story." *Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 550 (8th Cir. 1997). "[T]he particularity required by Rule 9(b) is intended to enable the defendant to respond specifically and quickly to the potentially damaging allegations." *U.S. ex rel. Costner v. United States*, 317 F.3d 883, 888 (8th Cir. 2003). "Because one of the main purposes of the rule is to facilitate a defendant's ability to respond and to prepare a defense to charges of fraud, conclusory allegations that a defendant's conduct was fraudulent and deceptive are not sufficient

to satisfy the rule." *Commercial Prop. Invs., Inc. v. Quality Inns Int'l, Inc.*, 61 F.3d 639, 644 (8th Cir. 1995) (internal citation omitted).

NYS argues that Fields "has failed to provide even basic details concerning the fraudulent activity it alleges on the part of NYS." (Dkt. No. 38, at 29). NYS acknowledges that Fields "alleges 'specific example[s]' of occasions when NYS alleged offered other customers better pricing than it offered Fields." (*Id.*; Dkt. No. 1, ¶¶ 38, 42-44). NYS argues, however, that "these paragraphs say nothing about when or in what circumstances NYS made any supposed misrepresentations to Fields *about* that pricing." (Dkt. No. 38, at 29). Fields responds that it has provided detail concerning the time, place, and contents of NYS's fraudulent misrepresentations in its complaint and in the affidavit of Patrick Burk, filed as an exhibit to Fields's response to NYS's motion to dismiss for lack of personal jurisdiction or to transfer venue (Dkt. No. 25, 25-1). Fields states that this affidavit provides additional detail identifying the two primary persons at NYS making fraudulent representations and makes clear that the representations were made in person and by telephone to Fields's officers and employees in Houston, Texas (Dkt. No. 58, at 19; Dkt. No. 25-1). Fields suggests that, if the Court determines more detail is needed in the complaint, any relief granted to NYS on its motion on this point should be without prejudice to Fields's amending its complaint to incorporate additional specific allegations such as those stated in the affidavit of Patrick Burk (Dkt. No. 58, at 27 n.6).

The Court finds that Fields's complaint fails to satisfy Rule 9(b). Although the complaint alleges some specifics as to the "what," "when," and "how," it does not provide any detail as to the persons at NYS who allegedly made the misrepresentations and only makes a conclusory statement that Fields relied on the statements without specifying what was given up or obtained thereby. To the extent NYS argues more facts in its motion and offers detail in the affidavit of

Mr. Burk, these matters were not included in the complaint.  Therefore, NYS's motion to dismiss as to Fields's claim for fraudulent misrepresentation is granted without prejudice to Fields's right to file a motion to amend its complaint within 14 days of the entry of this Order.  The Court need not reach NYS's remaining arguments as to this claim.

### 3.      Negligent Misrepresentation

Fields's complaint also purports to state a claim for negligent misrepresentation on the same facts as the fraudulent misrepresentation claim (Dkt. No. 1, ¶¶ 47-49).  As NYS notes, Arkansas law does not recognize a cause of action for negligent misrepresentation (Dkt. No. 38, at 22).  *See Curtis Lumber Co., Inc. v. La. Pac. Corp.*, 618 F.3d 762, 774–75 (8th Cir. 2010); *S. Cnty., Inc. v. First W. Loan Co.*, 315 Ark. 722, 725-26, 871 S.W.2d 325, 326 (1994)).  Therefore, as a matter of law, Fields has failed to state a claim for negligent misrepresentation upon which relief can be granted pursuant to Rule 12 (b)(6) of the Federal Rules of Civil Procedure.  NYS's motion for judgment on the pleadings as to this claim is granted.

### 4.      Conspiracy

Fields alleges that "[NYS] and Skyline entered into an agreement to give Skyline a competitive advantage in the relevant market during the covered period by providing Skyline with preferential pricing, product availability and geographical preferences in violation of United States antitrust laws" and that "[a]s a result of this agreement, both [NYS] and Skyline intentionally interfered with other potential project suppliers such as Fields in order to allow Skyline a competitive advantage in securing contracts over Fields." (Dkt. No. 1, ¶¶ 34-35). Fields further alleges that, as a result of the alleged conspiracy, it lost several contracts and suffered damages for which it has not been compensated (*Id*., ¶ 36).

NYS argues that Fields had failed to state a claim for conspiracy because, under Arkansas law, conspiracy is not a separate tort and must be predicated on some other underlying tort, citing

language in *Varner v. Peterson Farms*, 371 F.3d 1011 (8th Cir. 2004), that civil conspiracy "is not a separate tort." *Id*. at 1016.   NYS argues that because Fields's claims for tortious interference and fraudulent misrepresentation fail, its claim for civil conspiracy must also fail. Under Arkansas law, "[a] civil conspiracy is a combination of two or more persons to accomplish a purpose that is unlawful or oppressive or to accomplish some purpose, not in itself unlawful, oppressive, or immoral, by unlawful, oppressive or immoral means, to the injury of another." *Mason v. Funderburk*, 247 Ark. 521, 529, 446 S.W.2d 543, 548 (1969).   "A conspiracy may be shown by direct evidence of an actual agreement or understanding between conspirators, but it may also be shown by circumstantial evidence." *Id*.   "It also may be inferred from actions of alleged conspirators, if it be shown that they pursued the same unlawful object, each doing a part, so that their acts, although apparently independent, are in fact connected and cooperative, indicating a closeness of personal association and a concurrence of sentiment." *Id*.

Fields responds that it has alleged that NYS and Skyline conspired to provide Skyline with a competitive advantage in the relevant market resulting in tortious interference with Fields's prospective business relationships (Dkt. No. 58, at 27-28).   Because the Court concludes that Fields adequately stated a cause of action for tortious interference, the Court cannot conclude that Fields has failed to allege a plausible claim for civil conspiracy.   NYS's motion on this point is denied.

### 5.      Breach of Contract Claims

Fields's complaint alleges that NYS breached the supply agreement "by failing to provide equal pricing of the steel products to Fields and Fields' competitors" (Dkt. No. 1, ¶ 51) and that NYS breached "its express and implied obligation to use best efforts to supply Fields with the steel products required during the covered period.   Specifically, [NYS] restricted Fields's

allocation of H-piles, and unreasonably refused to make additional rollings of such products available to Fields during the covered period."  (*Id.*, ¶ 53).   NYS asserts that both claims disregard the plain language of the parties' contract, which states that NYS had the sole discretion to determine purchase price and that NYS had the absolute right to schedule production as it deemed appropriate (Dkt. No. 38, at 30-31).  In addition, NYS cites two merger clauses in the contract and in the attached terms and conditions of sale (*Id.* at 31-32).[9]  Fields responds that the Uniform Commercial Code ("UCC") governs the parties' contract and provides Fields with a cause of action for breach of contract (Dkt. No. 58, at 29).  NYS argues that Fields failed to plead the UCC in its complaint and that Fields may not "amend" its complaint to reflect what NYS considers to be a "new theory" (Dkt. No. 60, at 23-24).  The Court rejects this argument.  Fields has not pleaded a new allegation or new cause of action in citing the UCC.

Where a contract for the sale of goods grants the seller the right to set the price known as an "open term" contract, the UCC requires the seller to set the price in good faith.  Ark. Code Ann. § 4-2-305(2) ("A price to be fixed by the seller or by the buyer means a price for him to fix in good faith.").  Good faith "includes observance of reasonable commercial standards of fair dealing in the trade if the party is a merchant. . . . But in the normal case a 'posted price' or a future seller's or buyer's 'given price,' 'price in effect,' 'market price,' or the like satisfies the good faith requirement."  Ark. Code Ann. § 4-2-305 cmt. 3; *see id.*, cmt. 6 ("Throughout the

---

[9]   Paragraph 17 of the contract states that "[t]his Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof, supersedes all prior representations, documents or statements transmitted between the parties, and may be amended only by written instruments signed by both parties." (Dkt. No. 38-1, at 6-7, ¶ 17).  The attached terms and conditions of sale provides, in part, "Except as otherwise agreed in a writing signed by Buyer and Nucor, the applicable Nucor sales order acknowledgement, together with these terms and conditions constitute the entire agreement between Nucor and Buyer relating to the sales of such goods by Nucor." (*Id.* at 9, ¶ 1) (The terms and conditions of sale uses "Nucor" to refer collectively to Nucor-Yamato Steel Company "together with its affiliates" (Dkt. No. 38-1, at 9)).

entire section, the purpose is to give effect to the agreement which has been made.  That effect, however, is always conditioned by the requirement of good faith action which is made an inherent part of all contracts within this Act."); Ark. Code Ann. § 4-1-304 ("Every contract or duty within this subtitle imposes an obligation of good faith in its performance and enforcement.") (formerly § 1-203); Ark. Code Ann. § 4-1-201 (20) ("'Good faith,'. . . means honesty in fact and the observance of reasonable commercial standards of fair dealing.").  Under Arkansas law, "generally speaking, the question whether a party has acted in good faith in a commercial transaction is a matter of fact to be determined by the jury." *Adams v. First State Bank, Beebe*, 300 Ark. 235, 240, 778 S.W.2d 611, 614 (1989) (construing "good faith" definition under Ark. Code Ann. § 4-1-201); *Midway Auto Sales, Inc. v. Clarkson*, 71 Ark. App. 316, 320, 29 S.W.3d 788, 791 (2000) (same).

NYS asserts that Fields's complaint fails to allege "what 'reasonable commercial standards' are in the H-piling industry, much less that the prices NYS charged to Fields were somehow outside those standards.  A mere allegation that one customer was offered or received a better price does not meet this requirement."  (Dkt. No. 60, at 24).  In support, NYS cites several cases holding that a price fixed pursuant to an open term contract need not be the lowest possible price to be reasonable under state versions of UCC § 2-305(2) (Dkt. No. 60, at 24-25) (citing *Tom-Lin Enters., Inc. v. Sunoco, Inc. (R&M)*, 349 F.3d 277, 282 (6th Cir. 2003) ("a price fixed pursuant to [Ohio's § 2-305(2)] need not be the lowest possible price."); *Ajir v. Exxon Corp*., 185 F.3d 865, No. 97-17032, 1999 WL 393666, at *7 (9th Cir. May 26, 1999) (unpublished table decision) ("All that the UCC requires is that a price term be reasonable, not the lowest possible.") (affirming summary judgment where evidence was undisputed that Exxon charged Franchisees prices similar to what other major oil companies charged their dealers)).  The Court

is not persuaded by the cases relied upon by NYS. Those cases were decided at the summary judgment phase and do not stand for the proposition that Fields's allegations should fail at the pleading stage as a matter of law.

More importantly, NYS's arguments ignore the second component of "good faith," the subjective component of "honesty in fact." *See* Ark. Code Ann. § 4-1-201(20). A breach of the duty of good faith can be established by improper motives even though the prices might appear to be objectively reasonable. In *Mathis v. Exxon Corp*., 302 F.3d 448 (5th Cir. 2002), the Fifth Circuit discussed at length the legislative history behind the UCC drafters' intent in including comment 3 to § 2-305 to embrace "both the objective (commercial reasonableness) and subjective (honesty in fact) sense of good faith . . . ." *Id*. at 455-56. Significantly, the court noted that in adding the subjective component of good faith, the drafters of the UCC expressly intended to preserve challenges to price discrimination. *Id*. at 456. *Accord Auto-Chlor Sys. of Minn., Inc. v. JohnsonDiversey*, 328 F. Supp. 2d 980, 1008 n. 16 (D. Minn. 2004) (noting that, under the subjective good-faith test of honesty-in-fact, "if Plaintiffs were told that they were paying 'virtually at cost' for parts/equipment and chemical products under the Dealer Contracts with open price terms, . . . but they were not in fact charged 'virtually at cost,' then it becomes a jury question whether Defendants were honest in fact."). Under this standard, and assuming the facts alleged in the complaint to be true, the Court concludes that Fields has stated a claim for breach of contract with regard to the pricing claim.

As to the claim that NYS breached the supply contract by failing and or refusing to supply Fields with product, Fields contends that § 2-306 of the UCC imposes an obligation of good faith for supply contracts (Dkt. No. 58, at 31). Section 2-306, as codified in Arkansas, provides:

> (1) A term which measures the quantity by the output of the seller or the requirements of the buyer means such actual output or requirements as may occur in good faith, except that no quantity unreasonably disproportionate to any stated estimate or in the absence of a stated estimate to any normal or otherwise comparable prior output or requirements may be tendered or demanded.
>
> (2) A lawful agreement by either the seller or the buyer for exclusive dealing in the kind of goods concerned imposes unless otherwise agreed an obligation by the seller to use best efforts to supply the goods and by the buyer to use best efforts to promote their sale.

Ark. Code Ann. § 4-2-306.

NYS argues that the parties contracted away the obligation of good faith imposed by § 2-306 because the contract gave NYS "the absolute right . . . to schedule production of its Products as it deems appropriate for business purposes. . . ."  (Dkt. No. 38-1, at 3; *see* Dkt. No. 60, at 25).  The Court cannot conclude from the face of the pleadings and the contract, as incorporated into the pleading, that this presents an unambiguous waiver of the obligation of good faith under § 2-306.  Therefore, the Court concludes Fields's claim is sufficient to survive a motion to dismiss.

Lastly, NYS alleges that Fields failed to preserve a claim for breach arising out of a failure to meet Fields's requirements because Fields failed to plead that it met the notice requirement stated in the contract.  That provision defines what events "shall constitute an Event of Default," which include "(b) Failure by NYS to supply pursuant to the terms of this Agreement Customer's requirements for Products to manufacture Products; which failure is not cured within ten (10) business days after sending of notice by Customer to NYS . . . ."  (Dkt. No. 38-1, at 3, ¶7).  Fields responds that any arguments whether it did or did not comply with notice provisions of the contract are purely factual assertions that cannot be addressed on a motion to dismiss (Dkt. No. 58, at 34).  The Court agrees that whether or not Fields failed to comply with a notice provision in the contract is a fact issue that is not appropriately before the Court on the current 12(b)(6) motion.

Accordingly, the Court concludes that Fields's claims for breach of contract are sufficiently pleaded to survive a motion to dismiss.

*      *      *

For these reasons, NYS's motion for judgment on the pleadings is granted in part and denied in part (Dkt. No. 37).  The motion is granted as to Fields's claims that NYS violated the Robinson-Patman Act by making product available to Skyline that it failed to make available to Fields or supplying Skyline with product in certain geographic areas that it failed to supply to Fields.  The motion as to Fields's claims for fraudulent misrepresentation is granted without prejudice to Fields's right to file a motion to amend the complaint within 14 days from the entry of this Order.  The motion is also granted as to Fields's claims for negligent misrepresentation. The motion is denied as to all other claims.

SO ORDERED this the 30th day of September, 2013.

Kristine G. Baker
United States District Judge